On behalf of the appellant, Mr. Pinch-Sinson, on behalf of the appellee, Ms. Molly M. O'Reilly. First of all, let me tell you both that Justice Bowman was unable to be here this morning. However, he will have the ability to listen to the arguments as presented here within 24 hours. So, if you're ready to proceed. Good morning. May it please the court. I'm here on behalf of the appellant, LeVon Vlodek. My name is Ken Sinson, and let me begin my argument by just pointing out the basic law of tort immunity in this area, which is that in order for the village to avail themselves of tort immunity, under the Hartnett case in the Illinois Supreme Court, they must prove or demonstrate that the person making the decision has both determined policy and exercised discretion. I would submit to this court that it is not part of the record in this case that they ever determined policy. And it was not a part of the ruling by the trial court that there was ever a determination of policy. I understand the concept, and we fully accept the concept, that sometimes in the appellate court, there can be other legal arguments advanced to support the judgment that was made in the lower court. And that's okay. But you still need to rely upon the factual basis that was developed in the trial court, which didn't happen in this case. And you still need to have the judgment that you're reviewing actually make a determination such that it can be reviewed. And in this case, the trial court never said that the person or the village was determining policy. She never reached that conclusion in this case. And I would submit or we would submit to this court that as such, there is no basis for a determination that the village was determining policy. And simply on that grounds alone, this summary judgment should be reversed. It's not the village determining policy, but this individual may determining policy. That's correct. And I would point out, too, the Gutstein case, which I fully admit is a first district case, and I know it's not binding here, but it's probably the most comprehensive discussion by any appellate court within the last year about this tort immunity area, looked at the issue of determining policy last June. And they looked at three Illinois Supreme Court cases, Hartnett, Hartnett, and the Chicago flood case. And they observed that really what happens when you're asking the court to look at people determining policy is, and they also looked at Justice Garment's dissenting opinion in the Van Meter case. And basically what she says there is the higher the person is in the hierarchy of the village, the more likely they ought to be a person determining policy. In Hartnett, it was the school district. In Hartnett, it was the fire marshal. In the Chicago flood case, it was the city of Chicago. In contrast and similar to Gutstein, in this case, it was Mr. May, who was the director of public works. In the Gutstein case, it was Mr. Crabtree, who was the public works supervisor. And I would submit that just like Gutstein finding that that's not a person who should be determining policy, that this court should reach that same conclusion. And it's interesting because if you compare Gutstein and you compare this case, they're so similar in so many ways. One way in particular they're similar is that in this case, Mr. May testified that the person who made the policy determination as to where to put the crosswalk was the village mayor and the village manager, not him. He had nothing to do with it, according to him. Well, I thought the village decided that they wanted it on this block, but exactly where on the block it was, he decided. They told, according to his testimony, my recollection from the record was they said, we want it somewhere on the block, right? I don't think they gave him a specific, any more direction than that. So he did the site determinations on exactly where it would be and then what type of signage and striping and all that stuff. He made those determinations. Well, yeah, I mean, as I've argued in the reply brief, if you read his testimony closely, it's almost, he doesn't really explain the thought process that he got there. But what he says is, I just basically went out there, took out two parking spots on either side of the street. I threw down some paint and there, poof, we had a crosswalk. So, I mean, as far as actual analysis, engineering analysis, we don't see that from his determination. But you are correct that what he, I believe that his direction was vague enough of this is going to be a mid-block crosswalk. It's not, and that's important because the MUCD, TCD, says specifically that when you're doing a mid-block crosswalk and it's not anticipated by motorists that they're going to have a crosswalk there because it's not an intersection, that that's the type of situation when an engineering study should be done. So, but he was given discretion. I do agree with you that, I do agree with the court that he was given discretion. Not discretion in how to do it, I still think his determination was mysterious, but discretion in the sense that they didn't pick a specific spot on that block where he would do that. I didn't want to ask you, I'm sorry. Okay, go ahead. I didn't want to have you slide into discretion because you were talking about policy. Right. But your argument is basically that this individual is so low or at a level low enough on the food chain, for lack of a better term, that he's not administering policy, he's not making policy decisions. Perhaps you could have a case out there where somebody this low was administering policy, but Gutstein didn't find it on somebody with almost the identical title. And in this case, like in Gutstein, where there was an alderman in Gutstein that was making a determination, and in this case where you have the village board and the village manager making a determination as to where to put it, it's our position that he was not exercising, determining policy. And the record doesn't support that. They never made those arguments, either at his deposition, before the trial court, or at all. The first time that they start talking about policy determinations is in their response brief, in this case, before this court. There is not a single iota of fact in this record that appears in any document before their response brief that talks about policy. Who was making the policy? Well, the policy apparently was made by, according to them, I mean, it's their burden, so that might be a better question for them. But as far as we can tell, the village board and the village manager was making a determination of policy. What Gutstein says, and it relies on two Illinois Supreme Court cases, Green v. Chicago, and then NRA, the Chicago flood case. And what Gutstein said is that even though there might be immunity for the policy determination of how to make the public improvement, that once you decide to make the public improvement, you still have to do so in a non-negligent, responsible kind of way. And it talks about how both the Green case and the NRA Chicago flood case support that conclusion. The city has a certain amount of discretion to decide whether or not they're going to even put a crosswalk in. But once they make that decision, they don't have the right, according to Gutstein, according to Green, according to the Chicago flood case, to just do it in any haphazard way. They must follow the MUTCD. So the immunity evaporates then? I mean, I had a question about that case. You know, you have the policy determination. They're immunized from that once they decide that they're going to do something. But then once they start doing it and they're making decisions on how to do it, they're not immunized because of the language in that case? Well, obviously the village board and the village managers are immune, but Mr. May and the decisions that he's made about how to implement it, just like Mr. Crabtree and the decisions that he made, are not immune. He's not determining policy, and he is acting in a ministerial way. Those are ministerial decisions at that point. This is an engineer deciding on where a crosswalk is, what type of, how big it is, what type of signage, striping, all those things. And he did testify that he used his engineering background and discretion in making them. He testified to some extent that he used his engineering knowledge and background and experience in making these decisions. But he's not exercising policy, he's not exercising his discretion, but these guys filling in potholes and robo-war. Well, respectfully, I disagree with the robo, but I would say this. When you look at this record, although there are parts in there where he claims that he's exercising discretion, I would also submit to this court that there are substantial parts of this transcript where Mr. May says he's consulting nothing and just not exercising discretion in any shape or form. Isn't that an exercise of discretion to know what's out there and say, you know what, I'm not going to follow that? No, I don't believe it is, Your Honor. Basically, I guess the best way to answer that question is maybe to talk about the Schneider case, which is an Illinois Supreme Court case. And basically what happened in Schneider was, and it's kind of a lead case in this area, so maybe it would be a good entry to explain how the court got to that conclusion. The Township Highway Commissioner did not consult the MUTCD in that case. That was his testimony, basically like Mr. May. He says, I didn't consult it. He said, I just put it up where I thought it would be safe based upon my judgment. And the appellate court and then the township argued, well, even though he didn't consult the MUTCD and he didn't consult it at all, that it still gave him the discretion to put it where he wanted to. And then the appellate court agreed, and what they found is that there was discretionary immunity because they said that unless there was a specific provision of the MUTCD that was violated, and he's already testified, but he didn't even look at it at all, that therefore the city's immune. And then the Illinois Supreme Court reverses that, and they said the question of whether or not the duty is breached is a jury question. And it's based upon the interpretation that the village was submitting at that point that the interpretation of the duty not to follow the MUTCD would allow the village then to put the sign upside down, put the sign behind a tree. And they said that's clearly not what tort immunity is all about. And they said that the MUTCD becomes meaningless with that type of an interpretation. And they specifically said that they were not adopting that. Snyder does not stand for the proposition, as my opponent has argued, that only the standards policies of the MUTCD must be followed. What it says is that there's a jury question and there's a fact question about whether it's been followed, and it has to be adhered to. The MUTCD never says that the engineering study only has to be done to determine where to place the crosswalk. They've argued that in their brief, but that's just contrary to the words of the MUTCD itself. So I don't know if that addresses your question, but it is our position that the MUTCD is put out there, obviously, for public safety. And we all, this world becomes a lot more dangerous if our roads don't have that kind of protection. And when the MUTCD says do an engineering study before you have a mid-block crosswalk, and somebody says I don't even need to look at that, I'm just going to throw some paint on the ground and everybody will be safe. I don't think that is enough for a village to claim immunity. We don't think it's enough for a village to claim immunity. Do you agree that the placement of signage, as discussed in Snyder, was a requirement under the manual, whereas here these are under the category guidances, the things that you bring up regarding this? I don't, and I would say this, is that Snyder specifically said there was just, obviously, the appellate court seemed to think... In the manual itself, in the manual, and as applied to the vehicle code, in the manual, are these placement of signs in Snyder, were they requirements? I didn't review the MUTCD signage requirements on that type of situation. I only am extremely familiar with the appellate court and the Supreme Court opinion in Snyder, so I can only answer the question to the extent that it's addressed there. I believe that what Snyder said was that it came up with a different opinion about that question than the appellate court did. The appellate court simply looked at the... The appellate court, Snyder, looked at it and said, we don't think there's any clear mandate in the MUTCD about whether the signage is required in this case. What the Supreme Court said is, we don't agree with that judgment, but more importantly, the jury needs to decide that question. So, that was how it was handled in Snyder. So, your testimony, and I would point out one other thing, too, because, Justice Burke, one of the things that you pointed out was, is that there is some testimony from Mr. May at various points about him using engineering judgment. We don't dispute that, but there are also... This record is replete with him saying things like, I didn't consult anything for the design of this crosswalk. I calculated no sight distances. I made no decision about to do an engineering study or not to do one. I didn't consider advanced warning signs. And when you have a situation like this, where the burden is upon the village to prove this immunity, and whatever affirmative defenses you have, you have a situation where the Tort Immunity Act has to be strictly construed, because it's great to be king and pass laws to say when you yourself can get sued, and of course, that's what the Tort Immunity does. And for that reason, it's strictly construed against municipalities, and you have the fact that on a motion for summary judgment, the facts are supposed to be taken on the light most favorable to the plaintiff and the non-moving party. I think it's overwhelming evidence here that when you take the parts of his testimony where he said he did nothing and consulted nothing, that there is more than adequate amounts of evidence in this record to rebut the suggestion that they're entitled to immunity. Didn't your expert say that he did nothing wrong? I mean, in your expert's opinion, he would have done it differently, but that this engineer didn't do anything in violation of any regulations or the law? No, I think what he said was that there was no statutory violations, and what he said was that this was a negligibly designed crosswalk. And I guess what that means is that if Whole Foods had built this crosswalk, there would be no immunity for them, in his opinion. It was only because there was a different standard from municipalities that we were there. It's negligently designed because it didn't comply with the standards? Correct, correct. And the standards, from your perspective, are mandatorily required? I think there's a fact issue about whether they're mandatorily required. That would be a question of law. They either apply or they don't. Well, Schneider kind of said that in those cases there can be jury questions as well. But I would say this. Standards can come in three different forms. They can come in standards, which everybody agrees are mandatory, guidances, which should be imposed unless there's an engineering judgment or an engineering study that allows you not to, and that's where all three of our complaints fall under, and then options, which are simply options. In this case, our complaint is that he didn't follow the guidance provisions, which should be complied with. And the only way you cannot follow those required guidance provisions is if you do an engineering study, which everybody admits that didn't happen in this case, or you exercise engineering judgment. He said in this case he didn't do that. No, he said he didn't do a study. That doesn't mean he didn't exercise his discretion. Well, right, but he didn't exercise engineering judgment. Right, that's another way of saying he didn't exercise discretion, but he says he did. I believe that if you read his testimony objectively and you read it in the light most favorable to the plaintiff, there is overwhelming evidence from his testimony that he did not consider any of these things. He did no sight distances. He did no advanced warning sign placement. He did no engineering study, which is our position. It should be done under the MUTCD as a guidance requirement unless you have an engineering study excusing it or you're exercising engineering judgment, which he clearly said he didn't do. Where is it? Can you point to anything that says it is an obligation of the village or Mr. May to get an engineering study? The MUTCD says that. It's a guidance provision. Okay. And it sets it at section 2C41 and it appears on page C551 of the record in this case. And it further says under guidances, which are at C542 and 543, that the guidances should be followed for the particular circumstances of the situation and it requires an affirmative consideration of the circumstances before you can reject the idea. He didn't consider anything. I didn't consult it. He says it in rather blunt terms. I didn't consider it. I didn't consult it. You can't have the MUTCD out there and step back and say, listen, I'm not going to listen to it. I'm just going to ignore it and not have the village lose immunity under those circumstances. I don't know where I am with time. Your time is up. Okay. I'm going to have more or less the court ask questions, but I do have five minutes of rebuttal. You do. Thank you. Good morning. Good morning. May it please the court, counsel, Molly O'Reilly, appearing for the appellee, Village of Westmont. First, I'd like to address a couple questions I think that you had, counsel, for the appellant. In the Schneider case in particular, that was a mandatory requirement under the MUTCD. The language is shall, which is mandatory. And that is why that case is distinguished from the case, the instant case. But really, a village engineer's decision regarding where and in what manner to place a mid-block crosswalk, such as in this case, is exactly the reasoning behind why the legislator passed Section 2-201 and 2-109 of the Illinois Toward Immunity Act to provide immunity for those types of decisions. While counsel refers to Stephen May as director of public works, there is no dispute. It's in the record that he was the engineer for the village and made policy determinations on that basis. The case law in this area in discretionary immunity-type cases looks to two factors, mainly. The first being whether there was a particular addressing of the dangerous condition by the public employee at issue, as seen in the Roble case, which I've cited in my brief. But basically, that's what the courts are looking for. That was even a laborer. That was a public works maintenance street worker. But because that worker had specifically addressed the pothole in question that caused the plaintiff's accident and determined policy in deciding, I have this much time to fill potholes on this street, do I remove the moisture, do I put the asphalt in, how to do those types of things. That's where they determined that they made the decision that, yes, immunity does apply because there was a specific addressing of the dangerous condition. The counsel argued that the trial court in this case did not make any finding whatsoever on whether this engineer was determining policy or not. How do you address that? I disagree with that. I think the case law cited throughout the briefs in Herrineck is very specific. You have to find both a determination of policy and an exercise of discretion. That's always been the case law in front of the trial court and throughout. I mean, it's the law in that area. Maybe the law, but he said that the trial court kind of forgot about policy and just talked about discretion. I disagree with that. I think that the trial court absolutely addressed the fact that this was a village engineer that we're talking about making these decisions. It's a much stronger case than even the Roble case because we're talking about someone that is establishing policy, that did address the issues, that takes into consideration the budgetary constraints, what he's allowed to do under the village budget, what manner to do it safely with several other crosswalks and other things around the area that this mid-block crosswalk was placed. So I absolutely think that the trial court did address that issue. In his policy decision to make it safe, is he required to follow the MUTCD standards? That's a good question. The standards, yes, but there were no standards that applied to this particular mid-block crosswalk. Because your position is it is a lesser requirement. Yes, it's a guidance. And specifically in the MUTCD, there are specific definitions. Guidance, and their expert agreed with me. One question, were any laws broken with respect to constructing this mid-block crosswalk? No. No, they were not. He repeatedly agreed with me that guidances are recommended but not mandatory practices and conceded that all of the things that governed the criticisms he had about this mid-block crosswalk fell under guidance. How much information is Mr. May required to have in deciding whether or not to follow a recommendation? Is he required to do a study? No, he is not. The guidance provisions allow for deviations from the guidance because, based upon his own engineering judgment. And I think it's undisputed in this case. It's in the record that, of course, he used his engineering judgment when approaching his decision-making with regard to this mid-block crosswalk. So he can decide not to follow a recommendation just based on his collective knowledge? Exactly. He's not required to have an independent study? That's your position? That's exactly my position. That's right. And, by the way, he explained that the reason that you do an engineering study is actually to determine the pedestrian traffic in the area, the traffic on the roadways in the area, to determine whether a traffic control device is required or not required. Because the determination had already been made that they wanted the mid-block crosswalk regardless, that engineering study was not required. I take it your argument is he's high enough on these levels, as indicated, and I think it was Heronic that he is still determining policy, even though the village trustees or mayor or whoever decided they wanted this crosswalk? That's right. Because just for them to decide that they wanted the crosswalk, yes, that is a decision. However, all of the issues involved with how many parking spots to take out, all of the engineering-type decisions are absolutely determinations of policy. Distinguish Gutstein, then, from this case? Yes. Gutstein basically dealt with a situation where we did not have an addressing of the dangerous condition whatsoever. That Gutstein involved an accident that occurred in an unimproved alleyway, and there was no evidence whatsoever that the Public Works Department ever addressed any sort of repair, anything in that alleyway at all prior to this plaintiff's accident in Gutstein. In this case, we have a specific person, Steve May, the village engineer, that addressed this mid-block crosswalk, that made the considerations, that went out there and measured and took steps. And, by the way, Gutstein also said Roble still applies. In that case, they distinguished their holding in Gutstein from Roble based upon the fact that in Roble there was actually a determination, there was an addressing of the dangerous condition, and in Gutstein there was no addressing of the dangerous condition whatsoever. That's why they did not find the discretionary immunity there. Same with Panley. Is there a difference between addressing a repair as opposed to addressing an initial creation of this crosswalk or any other new traffic control device? No. I don't think that there is. I think it's Roble basically extended, if you will, I think, the immunity, the discretionary immunity. It's a stronger case here that we have discretionary immunity for the village engineer in dealing with this major construction of a mid-block crosswalk than a maintenance street worker dealing with the repair of a pothole. So I think we are kind of dealing with a maintenance issue, which largely in the past in these discretionary immunity cases wasn't always the case. They distinguished between was it actually just doing a ministerial repair or not. But here we don't have that regardless. I think the law was somewhat extended with Roble, but I think this is a different case. So here if Mr. May looks at it, thinks about it, weighs the various considerations, that's sufficient, regardless of whether the outcome of his analysis is in fact creating a safe crosswalk? Yes, because even if he, because he used his discretion and was determining policy, even though it was abused, he still has discretionary immunity under 2.201 and 2.109. In the Capps case, didn't they decide or the court decide that the school district was not making a policy decision when they were putting this handicap ramp or whatever it was? They did. That was the holding in Capps. That's a 5th district case. And I think that the Capps case can be distinguished from this case in that the handicap ramp, they did find that the construction of the ramp itself was entitled to discretionary immunity. It was some of the other components of that ramp that they found were ministerial. The handrails or things like that? Right, exactly. But I think largely in this case we're dealing with a much larger improvement project that is clearly, there's so many engineering type decisions that have to go into a crosswalk like this. He put ramps in, wrecking, you know, signage. What type of material you put to reflect up, you know, the law mandated some signage that he utilized in this crosswalk. And I think those types of decisions are not simple decisions, maybe that Capps found that the railing may have been in that case. I think it is distinguished, actually, on that basis. In terms of, I'll move on to the other issues that the court would like me to. There's a lighting issue in this case, a maintenance of the lighting in the area of the accident. One, I don't think that the lighting was, that there's a sufficient issue with regard to that lighting not being operable at the time of this accident. But even if you take that out of the equation, whether there may be an issue of fact there, there certainly is no actual or constructive notice to the village regarding any sort of lighting issue. The only real evidence we have regarding any maintenance records, Steve May looked back, the village engineer, and determined that there had been no maintenance on this area. There's no evidence, and I think it's the plaintiff's burden to establish constructive or actual notice under the Burke case. And he has not done that. The evidence that he does cite to is a comment made in the deposition of the driver of the vehicle that struck the plaintiff in the crosswalk that she thought maybe the lighting may have been out. But it was raining, there was poor visibility in general, that she indicated that to the police officer that arrived at the scene after the accident, and he agreed with that statement. That's the extent of the testimony that's in the record in this case. I don't think, I'm certain that that is not enough to establish constructive and actual notice, because it was not any notice, there's no evidence of notice prior to this accident occurring. And then finally, I think the 3104 of the Tort Immunity Act is very clear and unconditional in the fact that it does specifically address the failure to provide any advanced warning sign in this case. There's absolute immunity for that. That was raised in an affirmative defense in front of the trial court. It is part of the record, and... It was not part of the summary judgment motion, though, correct? It was not. It was part of the trial judge French's ruling. Nobody argued it, she just came up with that? I did not argue it in front of the trial court. It was attached, obviously, to the motion for summary judgment and relied on by the court. How do you address back to the 201 issue? How do you address counsel's argument that the engineer never really even thought about the manual? He's been an engineer for 20 years. What he explained in his deposition is that he did not pick up, physically pick up the manual. He has a working knowledge of the manual. And his testimony is very clear in saying that he relied on not only the MUTCD, the supplement, but also his engineering knowledge over the years in constructing the mid-block crosswalk. If there's no further questions, thank you. Thanks very much. Counsel, do you wish to reply? Section 2C.4.41 of the MUTCD says an engineering study should be performed for a crosswalk installed for a non-intersection pedestrian crossing. That's at page 551 of the record. And it also says that adequate visibility should be provided by parking prohibitions. And that is section 3B.28, and that's at 551 of the record. Those are both guidances. And under the MUTCD, guidances should be followed for the particular circumstances of the situation, and they are recommended practices to be followed. The only exceptions when they are not followed are as if there's an engineering study done, which in this case, there was not one done. And it's kind of the top tautology of it is sort of interesting because you're supposed to use an engineering study to determine whether you need an engineering study. But it was not done in this case. And or whether or not engineering judgment was exercised. And he testified on pages 313, 344, and 345 of this record that he did not consult the MUTCD. And as such, all these guidance provisions, which are crucial to the safety of the public, become meaningless under the village's interpretation of the Tort Immunity Act. And I don't think that's the case. Did he or did he not testify that he had a working knowledge of this manual? I mean, at some point he did. But I would say this. If you look at the other parts of the record, which we're in a situation where we're strictly construing the Tort Immunity Act against the village. We're in a situation where we're taking every inference against the non-moving party, which is us. And then you take the testimony that he did give. It's very clear from this record that he, at several points, says, I didn't make any consultation with the MUTCD. You know, basically, I mean, I argued in my reply brief that it's almost as if he said, poof, we have a crosswalk here. What's interesting about this is that one of the most dangerous things about this crosswalk was the fact that my client couldn't see the cars coming down, flying down the street. And the cars coming down the street couldn't see her. And why was that? Because they had allowed parking spots to be so close to this crosswalk that she was like walking down a tunnel before she ends up stepping out into the street. Any engineering study, the whole purpose of having one was to recognize that danger, to prevent that danger from occurring. And that's the whole purpose of it. Sight distances are not a small matter in this case. They make a mid-block crosswalk, which the average motorist would not expect there to be a crosswalk there, safe. And in order to do that, you just don't take two parking spots on either side of the street, block those out, make a little tunnel for people to walk down there, and then say, oh, well, this is safe. And that's essentially what he did in this case. He doesn't calculate the speed of the people coming, her walking into the street and being able to look around. She testified, the plaintiff testified in her deposition, hey, I couldn't see anything because there was a big giant car or truck sitting in that first parking spot that I can't see around. And, you know, the village, the way this was is he simply threw down some paint on this thing, called it a temporary crosswalk, and did not comply with the safety protections that were built into the MUTCD. And what we're saying is they're not entitled to immunity under these circumstances. Why aren't they mandatory, then? Why is this structure set up that some are mandatory, some are recommended, and some are merely optional? Right. You seem to be arguing that we should take that which is a guidance and make it mandatory and therefore impose this duty. No, I'm not suggesting that. What I'm suggesting is that standards are things that there is only one way that you can build a crosswalk. It had to comply with the standards if that was a problem. Guidances are, you don't have to follow guidance, but you've got to do the important think-through process before you reject it. In other words, you've got to do the engineering study and make sure you've got a safe crosswalk. And then it's fine. Once you've done that, once you determine, you look at that guidance and you say, all right, we need to look at sight distances because we can't assure ourselves that the public is safe unless we have good sight distances. Once you do that and once you digest that, because what's mandatory is the consideration of it. And that, in a sense, even though it's called a guidance, there's really more than that. It's a guidance in the sense that you can determine not to follow it, but it's not a guidance in the sense that you have to at least consider it. And he didn't consider it in this case. And you base that on the pages that you cited where he says, I didn't actually consult this book, this manual. Right. He said he did. He absolutely did. Okay. And you're saying anything short of that means that there was not a full analysis. Right. But a full analysis requires, it's not just about looking at the book. It's also looking at the book and doing what the book tells you. That makes it mandatory. What I'm trying to distinguish is what's the difference between a mandatory standard and a discretionary standard if you're saying you have to look at it and then follow it? That makes it mandatory. And that's where I perhaps am losing the distinction. I think it can be mandatory in the sense that it can create factual issues. If you look at the guidance provisions under the MUTC about how it defines guidance, because clearly if it becomes merely optional, then it doesn't have any meaning at all. Basically what you're saying to all the village engineers are, follow the standards. The guidances are a joke. No one needs to follow those. The options are a joke. No one needs to follow those. And if you don't violate the standards, then you're free and clear. I don't think that's how the MUTCD was intended to be read. What it was intended to be read was you have to follow the standards. The guidances you can follow if you give some serious consideration as to why you're not following them. And the options are just what they are, options. And that's the reading of it, and I would suggest on page 542 and 543 of the record are very clear that it should be followed unless you get to this additional analysis. Guidances, they're not mandatory in the sense that you can only put the strike down at this location. Counsel, let me understand this. So you're saying as long as he went through an analysis, even though he may have come up with the wrong conclusion, tort immunity applies. But your argument here is that he did not consult the book, therefore his analysis had to inherently be defective. He never testified that he did the analysis that the MUTC required him to do. I agree with everything you just said. But it's not just a question of he didn't look at the book. Under the guidance provision, it requires him to look at the book and consider certain things. And in this case, I'm going to look at the book. Regardless of whether he looked at the book or not, you're saying he did not complete that analysis. Correct. Okay. Okay. I'm sorry. Do you have any additional questions? I have more, but I think I hear a little beep. So, of course, thanks. All right. Thank you very much. We'll be in recess. Have a decision in due course.